2022 IL App (2d) 210334
No. 2-21-0334
Opinion filed May 10, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| CLYDE WRIGHT, as Father and | ) | Appeal from the Circuit Court |
| Next Friend of Jordan Wright, a Minor, | ) | of Lake County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-L-386 |
| | ) | |
| WAUKEGAN COMMUNITY UNIT | ) | |
| SCHOOL DISTRICT 60, d/b/a CUSD60 | ) | |
| Community Unit School District 60, | ) | Honorable |
| | ) | Luis A. Berrones, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices McLaren and Jorgensen concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiff, Clyde Wright (Clyde), brought a two-count negligence action against defendant, Waukegan Community Unit School District 60 (District), after his 10-year-old son, Jordan Wright (Jordan), was injured by a roller gate fence at the Carman Buckner Elementary School (Carman Buckner) playground in 2017. The first count alleged that the District failed to maintain a safe premises as required by section 3-102 of the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/3-102 (West 2016)), in that it, *inter alia*, left the roller gate fence unlocked in an area where it knew that children played. The second count alleged that the District acted willfully and wantonly by, *inter alia*, leaving the roller gate fence unlocked in an

area where it knew that children played, and, thus, it was not entitled to immunity under section 3-106 of the Act (*id.* § 3-106). The District moved for summary judgment, citing *Shull v. Harristown Township*, 223 Ill. App. 3d 819 (1992) (the roller gate fence presented an open and obvious danger to the eight-year-old child). The District argued that, in light of *Shull*, as a matter of law, the roller gate fence here presented an open and obvious danger to a reasonable child of Jordan's age and, thus, the District had no duty to protect Jordan from the dangers associated with the roller gate fence. The trial court agreed and, finding no duty, entered judgment for the District as to both counts. On appeal, plaintiff argues that *Shull* is distinguishable, and we agree. A genuine issue of material facts exists as to whether the instant roller gate fence presented an open and obvious danger to a reasonable child of Jordan's age. Further, we reject the District's argument, raised for the first time on appeal, that it is entitled to summary judgment based on the question of willful and wanton conduct. Accordingly, we reverse and remand.

¶ 2                                   I. BACKGROUND

¶ 3      The roller gate fence at issue separates a parking lot from the playground area at Carman Buckner. The playground area has a basketball court and colorful games painted on the blacktop surface. The photograph exhibits show the fence to be the width of seven to eight parking spots, or more than 50 feet. The fence has a roller gate on the left side from the vantage point of the playground side. The gate is approximately 10 feet wide. The roller gate slides horizontally along the fence to create an opening for utility equipment. The gate has one wheel (or roller) at the top and one at the bottom, both of which are the same grey metal color as the rest of the fence. The roller gate is typically kept in a closed and locked position, such that it would not slide when pushed. The roller gate was not closed or locked at the time of Jordan's injury. There were no warning signs near the fence.

¶ 4       Jordan was injured while hanging on the roller gate fence waiting for his turn to play basketball on a summer evening, just before dinnertime. He climbed up the fence partway, put his hands on either side of the top roller wheel, and turned around to watch the other children play. Another child pushed the gate, and the roller wheel traveled over Jordan's left hand, amputating the top portion of his middle finger and injuring his ring finger. Jordan underwent surgery, but doctors were unable to reattach the finger. Jordan participated in rehabilitation therapy to attain optimal use of his hand but, three years out from the surgery, he continues to have difficulty typing on a keyboard and his finger hurts upon impact with other objects such as when catching a basketball.

¶ 5       On May 28, 2019, plaintiff filed the aforementioned two-count complaint in negligence against the District. On March 24, 2021, the District moved for summary judgment on the single basis that it owed no duty to Jordan. It argued: "The straightforward issue presented by this motion involves whether [the District] owed a duty to [Jordan]. If the gate at issue posed an obvious risk of injury to [Jordan], there was no duty and, thus, no liability on the part of [the District]." The District relied almost exclusively on *Shull*, a Fourth District case involving a child injured by an unlocked roller gate fence. *Id.* at 829. In that case, the appellate court had stated that, "as a matter of law," the unlocked roller gate fence presented an open and obvious danger. *Id*. The District did not argue that, even if it had a duty, it had not acted willfully and wantonly. On May 4, 2021, plaintiff responded. Plaintiff distinguished *Shull* and argued that whether the unlocked roller gate was an open and obvious danger presented a genuine issue of material fact precluding summary judgment. Plaintiff did not address the willful and wanton conduct issue, because the District had not raised it. On May 18, 2021, the District replied, again relying heavily on *Shull*. The District cited section 3-106 of the Act to note the heightened standard by which plaintiff ultimately would

be required to prove the District's liability, but the District did not suggest, let alone argue, that it should be granted summary judgment on the basis that it had not acted willfully and wantonly.

¶ 6        In their respective briefs, the parties cited the deposition testimony of five witnesses: Clyde, Jordan, Roger Johnson (Carman Buckner's head custodian), Otis Hickman (the director of custodial operations for the District), and Robert Silva (Carman Buckner's principal).

¶ 7        Clyde testified that, on June 22, 2017, at between 5 p.m. and 6 p.m., he gave his daughter, then age 13, and Jordan, then age 10, permission to play basketball two blocks away at the local elementary school. He told the children to come home for dinner when the streetlights came on. Instead, shortly thereafter, he heard Jordan running home, crying loudly. Clyde saw that Jordan had already wrapped his hand in a towel. Clyde told Jordan to go to the sink to wash his injury. When Clyde went to the sink to help Jordan, he observed Jordan's missing fingertip. He immediately rewrapped Jordan's hand in the towel and drove with Jordan to the playground to retrieve the fingertip, in hopes that it could be reattached. The other children at the playground pointed Clyde in the direction of the fingertip. Clyde prioritized Jordan's need for medical attention and, thus, he did not take time to ask the other children what happened. Clyde did observe that the gate portion of the fence was unlocked that day. Clyde believed that the gate was often unlocked.

¶ 8        Clyde recalled his initial conversation with Jordan about the incident. Jordan did not explain that his finger had gotten crushed by the roller. Instead, "[Jordan] said he was hanging on the fence and somebody must have closed it on him. He was like still kind of in shock, so he was saying like somebody might have closed it, but somebody helped him out, and then he [saw] the kid [run] away." Later, at the hospital, Jordan told Clyde about the roller.

¶ 9        Clyde never told Jordan not to play on the fence. Clyde attended parent-teacher conferences, and the teachers never brought up Jordan's behavior on the playground.

¶ 10    Jordan testified that the incident occurred the summer before fourth grade. He had been a student at Carman Buckner during second and third grades. He had played on the playground many times—nearly every day during the school year and frequently during the summer. Neither his teachers nor his father had ever told him not to climb on the fence. He did not know that he should not play on the fence. He had climbed the fence just once prior to the incident. On that prior occasion, he climbed to the top of the fence and jumped over at a point on the fence to the right of where the current incident occurred. He did this "just to play." Nothing happened. The fence did not move.

¶ 11    According to Jordan, the incident occurred as follows. He was at the school playground on the same side of the fence as the basketball court. He climbed partially up the fence and placed his hands on either side of the top roller (although he did not notice the roller at the time). As he hung on the fence, he turned around to watch the other kids play basketball. Suddenly, the fence moved so fast, he did not know what was happening. ("When the roller was running over your finger, you didn't know what was happening?" "No.") He did not see another child push the fence, but he realized after the fact that is what happened. The child, whom he did not recognize, helped him extract his finger from the roller. The child then ran away. Because Jordan did not realize he was in danger prior to the incident, he had not noticed from which direction the child had come to push the fence.

¶ 12    The only children Jordan recognized at the playground that day were his sister and one other boy, whom Jordan named. However, Jordan did not believe that either of them witnessed the incident.

¶ 13    Prior to the incident, Jordan had never experienced the fence moving on the rollers. He had not noticed the rollers at all. It would not have occurred to him that the rollers could go over his

fingers. After the incident, he knew that the rollers posed a risk of injury. ("If you saw the rollers, would you appreciate or would you understand that those rollers could roll over your hand?" "Yes." "You said yes?" "*Now*, yes." (Emphasis added.)) Jordan reported that the injury had been very painful. In the beginning, he could not sleep from the pain.

¶ 14 Carman Buckner's head custodian, Johnson, testified that, during the summer of 2017, he worked at Carman Buckner from 6:30 a.m. to 3 p.m. He had three custodians reporting to him and they began after 3 p.m. The last custodial shift ended at 11 p.m. Children were invited into the school, Monday through Friday, for a summer breakfast and lunch program. Additionally, although the playground was not staffed, it was open to the public.

¶ 15 Typically, Johnson kept the roller gate shut and locked with a padlock, which could be opened with a universal key. Every custodian in the District had that key. Johnson could not say for certain why the roller gate may have been unlocked that day. However, it may have been unlocked to give workers access to bring in mulch and/or to give contractors access to fix air conditioning units. He did not believe that he was the one to unlock the gate and leave it unlocked.

¶ 16 The District's director of custodial operations, Hickman, likewise testified that the roller gate was typically kept closed and locked. At the same time, he did not believe that there was an express "rule" to keep it closed and locked. He further stated that Johnson would know better than he whether the roller gate was typically closed and locked. Hickman believed that every custodian in the District, as well as every principal, had the universal key necessary to lock and unlock the padlock securing the roller gate.

¶ 17 Hickman acknowledged that, in November 2015, he had approved a work order to grease the wheels on the roller gate due to staff complaints that it was too difficult to move. It was corroded. In approximately August 2017, the District proposed removing the roller gate fence.

Hickman stated that this had nothing to do with Jordan's injury. Rather, "the fence was old. It needed to be upgraded." The roller gate fence, upgraded with poly-vinal rollers, was reinstalled at the District operations building. A new, ordinary fence without a roller gate was installed at Carman Buckner. Carman Buckner did not need a roller gate fence, as it had another access point for equipment.

¶ 18    When Hickman inspected the wheels on the roller gate fence in conjunction with approving the work order to have them greased, he was not aware that the wheels could cause an amputation. Still, if he had seen children playing on the fence, he would have told them to get down.

¶ 19    Silva, Carman Buckner's principal, testified that he knew Jordan. Prior to the incident, he had "congenial" discussions with Jordan, he could not recall any specific disciplinary incidents involving Jordan, and he knew Jordan to be "the normal average fourth grader." Silva did not believe that children should be playing at the school yard when school was not in session. Still, he agreed that, if he had seen children playing basketball at the school yard in the summer, he would not have asked them to leave.

¶ 20    Silva routinely checked the school grounds for safety issues. As a principal, he instructs staff to "redirect" students who climb the fence, because "it's not safe." Silva believed that climbing a fence was not safe because "the fence wasn't built for that purpose." At the same time, Silva did not have an express "rule" against climbing the fence. Silva has not been formally trained to avoid pinch points on equipment. Silva was not aware that the gate could cause amputation.

¶ 21    Silva agreed that the roller gate fence was usually kept closed and locked. Contrary to Hickman's testimony, Silva denied having a universal padlock key. Rather, if he wanted to unlock the gate, he would ask a custodian. He did not know who opened the gate on the day in question.

¶ 22    On June 1, 2021, the trial court granted the District's motion for summary judgment. The

court did not provide a basis for its decision. However, the parties have provided this court with the following agreed statement of facts:

> "Oral argument for Defendant's Motion for Summary Judgment was on 6/1/21 at 9:15 A.M. The parties relied upon their briefs in oral argument. The Defendant made arguments consistent with [its] Motion for Summary Judgment and Reply brief. Plaintiff made arguments consistent with his Response brief for Defendant's Motion for Summary Judgment. The Parties cited no new cases. Based upon the briefs submitted by the parties, the Court stated that there was no question of fact raised by Plaintiff, and therefore, *Defendant's motion for Summary Judgment, claiming that the condition was an open and obvious risk, was granted.*" (Emphasis added.)

This appeal followed.

¶ 23                                   II. ANALYSIS

¶ 24     Plaintiff appeals, arguing that a genuine issue of material fact exists as to whether the roller gate fence in this case was an open and obvious danger such that it was error to grant summary judgment. As stated, we reject the District's argument, raised for the first time on appeal, that it is entitled to summary judgment based on a lack of willful and wanton conduct.

¶ 25     A motion for summary judgment should be granted only when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). Summary judgment is a drastic means of disposing of litigation. *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 423 (1998). As such, the court must construe the record strictly against the movant and liberally in favor of the nonmovant. *Id.* at 423-24. The movant's right to summary judgment must be clear and free from doubt. *Id.* at 424. "[W]here

reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact." *Id.* We review an order granting summary judgment *de novo*. *Id.*

¶ 26    The elements of a negligence claim are: (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the breach was a proximate cause of the plaintiff's injury. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 19. Here, plaintiff has brought his negligence claim in the context of the Act. Again, in count I, plaintiff alleged that the District failed to maintain a safe premises as required by section 3-102 of the Act, which provides in relevant part:

> "Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." 745 ILCS 10/3-102 (West 2016).

¶ 27    In count II, plaintiff further alleged that the District acted willfully and wantonly and, thus, was not entitled to immunity under section 3-106 of the Act, which provides:

> "Neither a local public entity nor a public employee is liable for an injury where the liability is based on the existence of a condition of any public property intended or permitted to be used for recreational purposes, including but not limited to parks, playgrounds, open areas, buildings or other enclosed recreational facilities, unless such local entity or public

employee is guilty of willful and wanton conduct proximately causing such injury." *Id.* § 3-106.

¶ 28 The duty to exercise ordinary care set forth in section 3-102 of the Act is a codification of the general duty of care set forth in common law. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 15. Under common law, a party who owns or controls land generally is not liable to protect against a potentially dangerous condition that is open and obvious. *Id.* ¶ 16. The term "obvious" means that " 'both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising ordinary perception, intelligence, and judgment.' " *Id.* (quoting Restatement Second of Torts § 343A, cmt. B, at 219 (1965)). For a condition to be open and obvious, the plaintiff must have been reasonably expected to discover it and protect himself against it. *Buchaklian v. Lake County Family Young Men's Christian Ass'n*, 314 Ill. App. 3d 195, 201 (2000). " 'In cases involving obvious and common conditions, such as fire, height, and bodies of water, the law generally assumes that persons who encounter these conditions will take care to avoid any danger inherent in such condition.' " *Bruns*, 2014 IL 116998, ¶ 16 (quoting *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 448 (1996)). Children of an age "allowed at large" are expected to appreciate an open and obvious danger. *Corcoran v. Village of Libertyville*, 73 Ill. 2d 316, 327 (1978). When determining whether an injured child should have appreciated the risk at issue, the court performs an objective test focusing on children of similar age and experience. *Durham v. Forest Preserve District of Cook County*, 152 Ill. App. 3d 472, 477 (1986).

¶ 29 Typically, whether a dangerous condition is open and obvious is a question of fact. *Bruns*, 2014 IL 116998, ¶ 18. For example, if there is any dispute as to the physical nature of the condition or how the condition might be perceived, or where it is possible for reasonable minds to draw divergent inferences as to the nature of the condition, the question must be decided by a trier of

fact. See *Buchaklian*, 314 Ill. App. 3d at 202 (summary judgment reversed where the evidence supported a reasonable inference that the locker-room floor mat upon which the plaintiff tripped was difficult to discover due to, *inter alia*, its size and lack of color contrast). Correspondingly, when there is no dispute as to the physical nature of the condition or how the condition might be perceived, or where there is no room for divergent inferences, the question may be decided as a matter of law. See *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 34 (the question of whether a 12-year-old boy put himself in the way of an open and obvious danger when he tried to steal aboard a moving freight train could be decided as a matter of law).

¶ 30    The District argues that, here, the physical nature of the roller gate fence was not in dispute and, thus, the question of its open and obvious nature can be determined as a matter of law. In addition, the District relies upon *Shull*, as it did below, in support of its position that a roller gate fence is, as a matter for law, an open and obvious danger to a young child. For the reasons that follow, we cannot say that a reasonable child of similar age and experience to Jordan should, as a matter of law, appreciate the risk associated with the roller gate fence. We distinguish *Shull* and find further support for our ruling in *Schellenberg v. Winnetka Park District*, 231 Ill. App. 3d 46 (1992).

¶ 31    The child in *Shull* was just one month shy of his ninth birthday when he, his 10-year-old brother, and one of their friends decided to play in the township storage yard. *Shull*, 223 Ill. App. 3d at 821. The storage yard was bounded by a roller gate fence, which was kept unlocked. *Id.* at 821-22. The gate portion of the fence was 16 feet wide. *Id.* at 822. The plaintiff, the child's father, specifically ordered the child not to play in the storage yard, though the child had disobeyed that order on more than one occasion. *Id.* The plaintiff was afraid the child would injure himself on items contained within the storage yard. *Id.* The manager of the storage yard testified in deposition

that he once saw young children playing on a rock pile in the storage yard, and he told them to leave. *Id.* However, he had never seen children playing on the roller gate fence. *Id.*

¶ 32    After playing at the storage yard for about 45 minutes, the child, his brother, and their friend decided to play on the roller gate. *Id.* at 823. They had never played on the gate before, but they soon discovered that if one child stood on the gate and the other two pushed it, the child could "[ride] the gate." *Id.* The child rode the gate this way five or six times before his hand was injured by the roller wheel. *Id.* The child testified in deposition that he knew the roller wheel was there. *Id.* During the other times that he rode the gate, he lifted his hands as he passed the wheel. *Id.* He further testified that he knew that, if he did not lift up his hands, the roller wheel " 'would roll right over [his] hand' and hurt him." *Id.* Ultimately, however, he misjudged the timing, the roller wheel went over his hand, and he was injured. *Id.*

¶ 33    The plaintiff pursued a premises liability action against the township, but the trial court granted summary judgment to the township. *Id.* The appellate court affirmed, holding that, as a matter of law, the roller gate fence was an open and obvious danger. *Id.* at 829. The court explained:

> "[W]hen a child swings on a gate, any gate is capable of causing injury. When the child knows of the risk and refuses to avoid the risk, the property owner should not be responsible for injuries suffered by the child. [Here, the child's] parents told him not to play in the township's yard. In addition, [the child] testified that while he was swinging on the gate, he knew he could injure his hand if it became lodged under the roller." *Id.* at 826.

¶ 34    The court rejected the plaintiff's argument that the child was required to appreciate the full extent of the injuries he could suffer if trapped by the roller wheel. *Id.* It reasoned that, even if the child did not understand the full extent of the injuries he could suffer, "[i]t was, however, obvious

to [the child that] he would injure his hand if he did not remove it before the roller approached. The risks posed to [the child] by the township's gate were obvious and known by him." *Id.* at 827.

¶ 35    The court also rejected the plaintiff's argument that the circumstance of the gate being unlocked rendered it unreasonably dangerous. *Id.* It reasoned that the unlocked gate did not interact with some other factor to increase the risk to the child, and it again stressed:

> "[The child] knew about the danger in keeping his hand on the gate when the rollers approached. He had ridden the gate five or six times before his injury occurred. Each of these times [he] knew to remove his hand. [He] clearly knew riding the gate was dangerous. Defendant had no duty to protect him from such an obvious risk." *Id.*

¶ 36    We disagree that *Shull* stands for the proposition that, as a matter of law, every roller gate fence presents an open and obvious danger to a young child. The facts in *Shull* are distinguishable from those in the instant case on many fronts. The child in *Shull* knew that the fence was also a horizontal sliding gate. He intended to "ride the gate." He knew that, if he did not remove his hand as the roller wheel approached, the roller would injure his hand.

¶ 37    Here, in contrast, the evidence supports the inference that Jordan thought of the roller gate fence as a fence only and not a rolling gate. Jordan referred to the fence as a fence and not a gate throughout his deposition. Jordan had climbed the fence once before and it did not move. Jordan had not previously noticed the wheels, which were the same color as the rest of the fence. Jordan was not aware of the mechanics of the gate. Jordan had not ridden the gate repeatedly before it rolled over his hand. When the roller wheel went over his hand, Jordan did not know what was happening. When he initially told his father what happened, Jordan did not describe the roller.

¶ 38    Unlike the child in *Shull*, Jordan did not intend to "ride the gate," nor had he ever seen it move. Rather, he intended to hang on what he thought was a stationary fence. As Johnson,

Hickman, and Silva all testified, the gate was ordinarily kept in the locked and closed position, such that it would not move. Unfortunately, the gate was left unlocked that day, another child pushed the gate without warning, and it moved. Under these circumstances, it should be left to the fact finder to determine whether a reasonable child of approximately 10 years should be expected to consciously appreciate the risks associated with a roller gate fence that was typically kept in a locked and closed position and that the child was not trying to make move.

¶ 39    In considering Jordan's testimony that *he* did not appreciate the mechanics of the roller gate fence, we are not conducting a subjective test. Rather, we have determined that a jury might reasonably find that Jordan's failure to appreciate the risks associated with the instant roller gate fence was typical for a child of similar age and experience. As Silva testified, Jordan was the "normal average fourth grader." Indeed, two adults—Hickman and Silva—both of whom *were* aware of the mechanics of the roller gate and both of whom knew that it should be kept locked and closed, testified that they did not appreciate the risk of amputation posed by the roller gate.

¶ 40    Additionally, while we have considered Jordan's—as well as Hickman's and Silva's—surprise that the roller gate caused an amputation, we are cognizant that appreciation of the risk "does not require the clairvoyance to foresee the precise injury which in fact occurred." *Choate*, 2012 IL 112948, ¶ 38. In *Choate*, the 12-year-old child did not foresee that attempting to board a moving freight train could lead to the precise injury of the amputation of his lower leg, but he knew the act was dangerous. *Id.* In *Shull*, the 8-year-old child did not foresee the precise *severity* of his hand injury, but he knew that riding the gate could hurt his hand, which he raised each time the gate went over the roller. *Shull*, 223 Ill. App. 3d at 826-27. In both cases, a reasonable child should be expected to understand that he exposed himself to an "unmistakable danger *** simply for the thrill of the venture." *Choate*, 2012 IL 112948, ¶ 39; *Shull*, 223 Ill. App. 3d at 827 (the

child knew the roller would injure his hand in *some* capacity if he did not move his hand). The facts of the instant case are distinguishable from *Choate* and *Shull* on this point. As discussed, it cannot be said that Jordan intentionally exposed himself to a danger.

¶ 41    Other cases, particularly *Schellenberg*, support our position. In *Schellenberg*, a 15-year-old boy entered Lake Michigan from the shoreline of a park district beach, ran three or four steps, put his arms in front of his head, and performed a surface dive, *i.e.*, he aimed to stay at or near the surface of the water upon entry. *Schellenberg*, 231 Ill. App. 3d at 48. The boy hit his forehead on the sandy bottom of the lake and suffered a spinal cord injury that left him paralyzed. *Id.* None of the park district lifeguards warned the boy against surface dives, nor did the park district post any warning signs. *Id.* at 49. The trial court granted summary judgment to the park district. *Id.* at 47.

¶ 42    The appellate court reversed, holding that whether the risks associated with performing a surface dive were open and obvious to a teenager presented a question of fact. *Id.* at 53. It distinguished the facts before it from those in most cases involving water, where the obvious risk at issue was drowning. *Id.* It also distinguished the facts before it from a diving case involving an adult—as opposed to a child—who dove off a pier—as opposed to the ground—and into a lake of uncertain depths. *Id.* at 49. Finally, it adopted the reasoning in another case involving surface dives:

> " '[T]he danger of diving head first into shallow water may seem at first glance to be a matter of common knowledge and understanding for which expert opinion is not needed. However, closer examination of the evidence indicates that the nature and extent of the danger of surface or horizontal diving by teenagers in all probability is not commonly understood, even by many adults of considerable experience.' " *Id.* at 50 (quoting *Leonard v. Pitstick Dairy Lake & Park, Inc.*, 124 Ill. App. 3d 580, 586 (1984)).

¶ 43 *Schellenberg*, together with *Shull*, demonstrate that, when considering whether a danger is open and obvious to a reasonable child of similar age and experience, it is not just the physical instrument or landscape at issue, but also the way a child intends to interact with them. In *Schellenberger*, the teenager interacted with a *typically* obvious danger, water, but in a way that he thought was safe. Whether the danger of his action was obvious to a reasonable teenager was a question of fact. In *Shull*, by contrast, the child previously observed the potential danger inherent in the roller gate fence and failed to protect himself from it. See *Sollami v. Eaton*, 201 Ill. 2d 1, 17 (2002) (a 15-year-old girl disregarded the obvious risk of performing an inappropriate maneuver on a trampoline). The law expects that reasonable persons will take care to avoid the danger *inherent* in certain obvious conditions. *Bruns*, 2014 IL 116998, ¶ 16. In water, that means drowning. In climbing a height, that means falling. Illinois jurisprudence does not, however, foreclose all recovery simply because a case involves water or, in this case, a fence.

¶ 44 The District argues, for the first time on appeal, that it is entitled to summary judgment on the alternative ground that there was no willful or wanton conduct. Plaintiff notes that, in the District's motion for summary judgment, the District "conspicuously" failed to address count II of plaintiff's complaint, in which plaintiff alleged that the District had acted willfully and wantonly. Willful and wanton conduct, however, is not a separate cause of action. *Doe-3*, 2012 IL 112479, ¶ 19. Rather, when the Act protects a defendant except in instances of willful and wanton conduct, the plaintiff must prove all the elements of an ordinary negligence claim, plus willful and wanton conduct. *Id.*

¶ 45 The fact remains, however, that the District did not plead the absence of willful and wanton conduct in its motion for summary judgment. The District's citation without argument to section 3-106 of the Act in its reply in support of its motion for summary judgment was insufficient to

substantiate a claim that it had not acted willfully and wantonly. While we can affirm a grant of summary judgment on any basis supported by the record, doing so based upon a theory not argued below would be inappropriate in the instant case. *Cf. Dunbar v. Latting*, 250 Ill. App. 3d 786, 789-90, 791-92 (1993) (the village argued that it was entitled to summary judgment based on no duty *and* section 3-106 immunity, the trial court granted judgment based on no duty, and the appellate court affirmed based on section 3-106 immunity). As stated, the District moved for summary judgment on the open and obvious danger issue, only. Moreover, as the parties have agreed, the trial court granted summary judgment based on the open and obvious danger issue, only. Finally, we observe that Hickman's and Silva's depositions were taken *after* the District's summary judgment motion was filed, with plaintiff on notice only as to the open and obvious danger issue, as regards the summary judgment motion. Accordingly, this record is not suited for consideration of the District's willful and wanton conduct argument, which it raised for the first time on appeal. To the extent that *de novo* review permits us to affirm the grant of summary judgment on the alternative basis of no willful and wanton conduct, we decline to do so on this record for the reasons stated above.

¶ 46                                   III. CONCLUSION

¶ 47     For the aforementioned reasons, we reverse the judgment of the circuit court of Lake County and remand for proceedings consistent with this order.

¶ 48     Reversed and remanded.

---

**No. 2-21-0334**

---

| | |
|---|---|
| **Cite as:** | *Wright v. Waukegan Community Unit School District 60*, 2022 IL App (2d) 210334 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 19-L-386; the Hon. Luis A. Berrones, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | David J. Kupets, of Law Offices of Kupets & DeCaro, P.C., of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Thomas G. DiCianni, Matthew A. Hurd, and Mary Jean Dolan, of Ancel Glink, P.C., of Chicago, for appellee. |

---